AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

LG Cellular phone
IMEI: 357093093191264

Case No.

FILED
AUG 23 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

'19 MJ 3575

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference

located in the     Southern     District of     California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952 and 960 | Importation of Methamphetamine |

The application is based on these facts:

See attached Affidavit of Special Agent Vincenzo L. Zoni

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Vincenzo Zoni, Dep't of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/23/19

*Judge's signature*

City and state: San Diego, CA          Hon. Bernard G. Skomal, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

    LG Cellular phone
    IMEI: 357093093191264
    (**Target Device**);

The **Target Device** is currently in the possession of the U.S. Customs and Border Protection Otay Mesa vault located at 9777 Via De La Amistad San Diego, CA 92154

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of November 13, 2018 up to and including February 13, 2019:

a.  tending to indicate efforts to import controlled substances from Mexico into the United States;

b.  tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

d.  tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the subject phone; or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

which are evidence of violations of Title 21, United States Code, Sections 952 and 960.

# AFFIDAVIT IN SUPPORT OF WARRANT

I, Vincenzo L. Zoni, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for warrant to search the following electronic device (**Target Device**): LG cellular phone, IMEI #357093093191264, as described in Attachment A (incorporated herein by reference), and seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952 and 960.

2. The **Target Device** was seized from Laura Chavoya Rios ("CHAVOYA" or "Defendant") incident to her arrest for violation of Title 21, United States Code, Sections 952 and 960, Importation of Methamphetamine, at the Otay Mesa, California Port of Entry on February 13, 2019. The **Target Device** is currently in the possession of the U.S. Customs and Border Protection Otay Mesa vault located at 9777 Via De La Amistad San Diego, CA 92154.

3. Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B (incorporated herein by reference.)

4. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times, and amounts are approximate.

//
//
//
//
//

## TRAINING AND EXPERIENCE

5. I am currently a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") formerly known as the ICE Office of Investigations ("ICE-OI"). I have been employed by ICE OI / HSI as a Special Agent since the agency was first created on March 1, 2003. From 2002 to 2003, I was a Special Agent with a predecessor agency, the Immigration and Naturalization Service. Prior to becoming a Special Agent, I served as Border Patrol Agent with the United States Border Patrol, from 1995 to 2002.

6. As a Special Agent for HSI, I am responsible for investigating laws enumerated in Title 8, Title 18, and Title 21 of the United States Code. Included in my responsibilities is the investigation of illicit contraband-smuggling, including narcotics-smuggling, across the United States border.

7. I have completed the USBP Basic Training Course at the Federal Law Enforcement Training Center located in Glynco, Georgia, as well as other follow-up courses required by ICE.

8. Since June of 2016, I have been assigned to the HSI Special Agent in Charge - Investigative Services Group as a liaison between HSI and the United States Attorney's Office for the Southern District of California.

9. Prior to my current assignment, I was assigned to the Deputy Special Agent in Charge San Ysidro, located in San Ysidro, California. My specific assignment was to the Narcotics Response Group. During my tenure, my duties included investigating the illicit trafficking of controlled substances into the United States. During my assignment to the Narcotics Response Group, I participated in the investigation of various drug-trafficking organizations involved in the acquisition, importation, transportation, and distribution of controlled substances into and through the Southern District of California. Because the nature of my ongoing work requires me to keep apprised of recent trends and developments involved in the investigations of drug traffickers, I regularly communicate with agents from the Drug Enforcement Administration, Customs and Border Protection

("CBP"), and other local and state law enforcement officers operating within the Southern District of California.

10. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, and tablets, to maintain communications with co-conspirators in order to further their criminal activities. Conspiracies involving narcotics smuggling generate many types of evidence including, but not limited to, evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, emails, instant messages, social networking messages, maps and directions, and phone numbers of co-conspirators.

11. In the course of my duties, I have been a case agent directing drug-related investigations. I have participated in many aspects of criminal investigations including reviewing evidence, conducting physical and electronic surveillance, and executing search and arrest warrants. I have interviewed defendants and witnesses while conducting various investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at the San Diego international ports of entry.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Drug smugglers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Drug smugglers will use cellular telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c. Drug smugglers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

3

    d.    Drug smugglers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e.    Drug smugglers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of Border Patrol checkpoints.

    f.    Drug smugglers therefore generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators.

13.    Based on my training and experience, including consultations with other law enforcement personnel, I know that drug traffickers commonly use electronic devices such as cellular telephones to store names, telephone numbers, records, drug ledgers, and other information pertaining to drug trafficking activity. I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating narcotics conspiracies that searches of cellular/mobile telephones yields evidence:

    a.    tending to indicate efforts to import controlled substances from Mexico into the United States;

    b.    tending to identify other facilities, storage devices, or services—such as email addresses, IP addresses, phone numbers—that may contain electronic evidence tending to indicate efforts to import controlled substances from Mexico to the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in smuggling-controlled substances from Mexico to the United States;

    d.    tending to identify travel to or presence at locations involved in the smuggling of controlled substances from Mexico to the United States, such as, but not limited to, stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the subject phone; or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

14.    Based upon my training and experience, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs; use cellular telephones, emails, and text messages to facilitate drug activity. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, without limitation, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, the use of multiple vehicles as conveyances for drugs and drug proceeds, and the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds.

15.    I also know from training and experience that drug traffickers periodically change or "drop" their telephones and/or telephone numbers in an attempt to avoid law enforcement interception of their conversations. Moreover, it is my experience that narcotics distributors purposefully use multiple communication devices (for example, cellular telephones) to keep law enforcement from understanding the full scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted. I also know that drug traffickers frequently use text messaging to communicate with other traffickers in an effort to thwart law enforcement interception of communications.

16.    Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers and portable radios to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard

narcotics, such as methamphetamine. Typically, couriers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Narcotics smugglers and their organizations use cellular and digital telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular and digital telephones.

17. Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

### FACTS SUPPORTING PROBABLE CAUSE

18. On February 13, 2019 at approximately 1:25 a.m., a U.S. Customs and Border Protection Officer (CBPO), was assigned to the vehicle primary lane at the Otay Mesa, CA Port of Entry. The CBPO made contact with the Defendant in vehicle primary lane 6. The Defendant was the driver and sole occupant of a black Ford Mustang bearing US/CA license plates (the "Vehicle"). The Defendant presented a U.S. Passport Card as her entry document, gave two negative customs declarations and stated she was headed to Chula Vista.

19. A CBPO Canine Enforcement Officer (CEO), with an assigned Human/Narcotics Detection Dog (H/NDD), was conducting roving preprimary vehicle inspections at the Otay Mesa, CA Port of Entry. The CBPO CEO screened the Defendant's Vehicle and an H/NDD alerted to a trained odor emanating from the interior side of the quarter panel on the passenger side of the trunk area. The CBPO CEO pulled down the liner attached to the quarter panel on the passenger side in the trunk area and observed plastic wrapped packages. The CBPO CEO requested assistance and notified lot officers

of the alert. The Defendant was escorted to the security office for further processing.

20. At approximately 1:30 a.m., a CBPO assigned to the Otay Mesa, CA Port of Entry vehicle secondary lot screened a black Ford Mustang with a Z-portal x-ray machine. The CBPO detected anomalies within the rear quarter panels on both sides of the vehicle. The CBPO notified secondary lot officers of the anomalies.

21. On February 13, 2019 at approximately 2:00 a.m., a CBPO assigned to the Otay Mesa, CA Port of Entry vehicle secondary lot performed an inspection of a black Ford Mustang. The CBPO discovered and removed forty packages concealed within the quarter panels of the vehicle. The CBPO probed one of the packages at random and observed a white crystalline substance, which field-tested positive for the characteristics of methamphetamine. The forty packages of suspected methamphetamine weighed approximately 22.10 kilograms.

22. On February 13, 2019, the Defendant admitted Post-Miranda that she had been communicating with an individual she knows as "Luis Antonio Gonzalez". The Defendant originally inquired about purchasing the vehicle on a Facebook chat group but did not have money. The Defendant agreed to do favors for "Luis" in order to keep the car. The Defendant stated that she knew "Luis" was involved in illicit activities, including previously smuggling aliens into the United States. The Defendant has been previously paid $900 USD and $1000 USD by "Luis" for crossing the vehicle into the United States.

23. The Defendant stated that "Luis" would text her directions to a shopping center in Los Angeles where she would turn the car over to an unknown male. The male would drive the car away for about an hour and bring it back. The Defendant would then drive back to Mexico and get paid. The Defendant admitted that she knew her actions were wrong and deleted prior messages from "Luis" in her phone to both save memory on her phone and also because she knew what she was doing was "not 100% right." The Defendant stated that her conversations with Luis started on Facebook and then they continued to communicate on WhatsApp. The Defendant stated that Luis's name on WhatsApp is "AL" and that when CHAVOYA and Luis first met they exchanged numbers

so they could communicate via WhatsApp. In the past, CHAVOYA said that Luis would use WhatsApp to send her messages about when the car was ready to be driven from the United States back to Mexico and what time he would arrive with the car she needed to cross. CHAVOYA said that Luis would text her on WhatsApp to say "same place" or would provide an actual address of where she was supposed to leave the Vehicle in Los Angeles.

24. The Defendant denied knowing that she was smuggling methamphetamine on the date of her arrest but thought it was something else illegal, possibly money concealed within the vehicle. The Defendant indicated that if she had successfully crossed, she was headed back to the same Los Angeles shopping center.

25. On March 12, 2019 the Defendant was arraigned on an Indictment charging Defendant with violation of 21 U.S.C. §§ 952 and 960, Importation of Methamphetamine in the Southern District of California in case number 19-CR-00867-JAH.

26. Officers seized the **Target Device** incident to CHAVOYA'S arrest.[1]

27. Based upon my experience and investigation in this case, I believe that CHAVOYA, as well as other persons, were involved in an ongoing conspiracy to import methamphetamine or some other federally controlled substance into the United States. Based on my experience investigating narcotics smugglers, I also believe that CHAVOYA may have used the **Target Device** to coordinate with co-conspirators regarding the importation of methamphetamine or some other federally controlled substance into the United States.

28. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the

---

[1] On February 13, 2019, Special Agent Kimberly Hesse reviewed the contents of the Target Device pursuant to border search authority. Nothing from the February 13, 2019 review is offered to support probable cause in this application.
I also declare that nothing from the prior search of the Target Device informs my decision to submit this affidavit to obtain a search warrant for the Target Device. I seek this affidavit independent of any information that was seen or reviewed (or not seen) in prior searches.

8

narcotics trafficking activities of CHAVOYA, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos, and other digital information are stored in the memory of the **Target Device**.

29. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in transporting their valuable cargo to its destination within the United States. Given this, I request permission to search the Target Device for items listed in Attachment B beginning on **November 13, 2018 up to and including February 13, 2019**. That date range is based on the fact that, based on my training and experience, CHAVOYA likely would have been in communication with co-conspirators to plan and coordinate her smuggle attempt, including acquiring the Vehicle, in the three months leading up to her arrest.

## METHODOLOGY

30. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions

for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

31. Following the issuance of this warrant, I will collect the subject cellular/mobile telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

32. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

33. Based on all of the facts and circumstances described above, there is probable cause to conclude that CHAVOYA used the **Target Device** to facilitate violations of Title 21, United States Code, Sections 952 and 960.

34. Because the **Target Device** was promptly seized during the investigation of CHAVOYA trafficking activities and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by CHAVOYA continues to exist on the **Target Device**.

35. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the item described in Attachment A and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
VINCENZO L. ZONI
HSI Special Agent

Subscribed and sworn to before me this __23__ day of August, 2019.

_____
Hon. Bernard G. Skomal
United States Magistrate Judge